COLUMBIA CORPORATION, INC., Respondent, *v.* INSURANCE COMPANY OF NORTH AMERICA, Appellant.

First Department, July 6, 1925.

**Insurance — fire insurance — action on policy to recover for loss of goods which were burned while in possession of another corporation — plaintiff contends that goods burned belonged to it and that they were in possession of other corporation on consignment only — policy provided that it would be void if insured concealed or misrepresented any material fact or swore falsely touching any matter relating to insurance whether before or after loss — evidence shows that president of plaintiff falsely represented and falsely swore that title to goods was in plaintiff at time of fire — defendant is not liable.**

The defendant insurance company is not liable on a policy of fire insurance for the loss of goods which the plaintiff claims belonged to it, but which were burned while in possession of another corporation, since it appears that the policy, a

standard fire insurance policy, contains a provision that the policy shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning the insurance or the subject thereof, or in case of any fraud or false swearing by the insured touching any matter relating to the insurance or the subject thereof, whether before or after loss; that the plaintiff, through its president, represented that the goods were in possession of said other corporation on consignment only, and that the title had not passed to said corporation at the time of the fire; and that the plaintiff's president swore to the same facts on the trial, but that the weight of evidence shows that the representation by the plaintiff's president and his testimony were false.

APPEAL by the defendant, Insurance Company of North America, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 12th day of April, 1924, upon a verdict rendered by direction of the court at the New York Trial Term pursuant to a stipulation that the action be tried without a jury and that a verdict be directed with the same force and effect as though a jury were present.

*Leo Levy* [*Harold R. Medina* of counsel], for the appellant.

*Meyer D. Siegel,* for the respondent.

BURR, J.:

The action was brought to recover under a policy of fire insurance issued by the defendant, the value of certain merchandise destroyed or damaged by fire in July, 1921. The single question presented to the trial justice and now presented on this appeal is one of fact with respect to whether or not the record shows fraudulent conduct on the part of the plaintiff in connection with the claim herein presented. The policy sued upon is the ordinary standard form and contains the following provisions: " This entire policy shall be void ·if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after loss."

The policy of insurance in suit. was one of four issued to the plaintiff. The other three policies were issued by the Sun Insurance Company, the Liverpool and London and Globe Insurance Company, Ltd., and the London Assurance Corporation, respectively.

Defendant alleges in its answer and sought to prove upon the trial that the claim of the plaintiff is made as the result of a conspiracy between Abraham Schwartz, the president of the plaintiff Columbia Corporation, the plaintiff's chief witness in this case, and Benjamin Kaplan, who was the general manager of the business of the Standard Artificial Leather Company, ·in whose premises

the fire took place. Kaplan had previously been in business himself but his corporation failed, his wife bought out the business and Kaplan remained as manager of the same business in his wife's name.

Kaplan had for many years been closely associated in business with Schwartz.

The plaintiff claims that in the months of April, May and June, 1921, a quantity of merchandise was shipped to Kaplan, that is, to the Standard Artificial Leather Company, on consignment and upon the distinct understanding that the title to the goods was not to pass until they were paid for. The plaintiff further claims that these goods were delivered to the premises of the Standard Artificial Leather Company, that they were not sold and paid for and that they were destroyed or so damaged as to be practically destroyed by the fire which took place in the premises on the 30th day of July, 1921.

Defendant insists that if Schwartz and Kaplan were doing business honestly, it would have been an easy matter for them to produce: (1) Bills or invoices in which the goods were described and identified; (2) receipts for the merchandise in which there would also appear a description and identification; (3) books containing entries evidencing the sale and delivery, also with some description and identification; and (4) bills and book entries showing the persons from whom the goods had been purchased by the Columbia Corporation.

The defendant claims and the evidence in this case tends to support the claim that both Schwartz and Kaplan were dishonest and that they both deliberately saw to it that their books and records, invoices, bills and receipts should all be in such condition that they could be shifted, altered and changed around as circumstances might subsequently render expedient, to the end that both Schwartz and Kaplan could separately make claim for payment from their respective insurance companies for the loss of the same identical goods.

It appeared on the trial that the plaintiff's original ledger sheet covering the period of April, May and June, 1921, had been destroyed and new ledger sheets had been fraudulently prepared from time to time, no less than two of which fraudulently prepared ledger sheets were produced and offered in evidence.

Schwartz was examined before trial on April 11, 1922. Bills and receipts relating to plaintiff's business were produced on that examination and Schwartz was examined at length regarding them. The result was that the discrepancies between these papers became very apparent and particularly the discrepancy in amount between

the bills then produced by Schwartz and the total for which the claim against defendant was made in accordance with the statement of loss prepared for the adjuster. The bills first produced by Schwartz on the examination before trial amounted to a total of only $6,926.37, or approximately $2,000 less than the statement prepared for the adjuster, which made a total of $8,710.89. Schwartz made no satisfactory explanation of the discrepancy.

Some time later when the first trial in the action brought by plaintiff against the Sun Insurance Company came on in the City Court it appeared Schwartz and Kaplan had in the meantime prepared defendant's Exhibit D-1, which was for the first time produced at the trial in the City Court. The exhibit appears in the record of the instant case and is dated June 25, 1921. Schwartz testified on the present trial that immediately after the fire he sent copies of the invoices to C. R. Young & Co., who represented plaintiff as adjusters of loss, so that the insurance might be adjusted. When interrogated on cross-examination as to whether or not he had delivered to C. R. Young & Co., defendant's Exhibit D-1, he testified as follows: " Q. Did you send to Young & Company a copy of that memorandum? A. A copy of that? Q. Yes or no? A. I don't remember. Q. Do you claim in this case for the Columbia Corporation the articles that are on that memorandum, Exhibit D? A. Yes. The Court: Do you claim the merchandise which is described in Exhibit D? The Witness: Yes, I do. Q. Did you ever give anybody a copy of that paper, Exhibit D, until the day of the second trial before Judge Callahan when you brought it into Court? A. If I gave anybody a copy of it? Q. Anybody? A. I don't remember."

The certified public accountant who was employed by the New York Board of Fire Underwriters to investigate this matter testified: " Q. I show you a paper that has been marked Exhibit D (handing witness paper) on this trial dated June 21, 1921, and ask you if prior to the second day of the trial before Judge Callahan in the City Court in April, 1922, you had ever seen that paper before? A. No, sir. Q. Did Mr. Siegel or did Mr. Schwartz produce it at the time of the examination before trial in April, 1922, at 193 Mercer Street? A. I did not see it. Q. Did you find in any of the books of account of the Columbia Corporation that you examined, any notation of that memorandum? A. No, I did not. Q. Does it appear in any way, shape or form upon the ledger in evidence, page 221, marked on this trial Exhibit D-1? A. No, it does not."

The evidence showed there was not a single entry in any of the

51

books of the Columbia Corporation which in any way referred to the subject-matter of this alleged document, a copy of which is as follows:

"Defendant's Exhibit D-1.
"Standard Artificial Leather Co.
"Converters and Jobbers in
"Artificial Leather & Automobile Fabrics,
"117 Bleecker Street.

"New York, *June* 25, 1921.

"Columbia Corp.,
"193 Mercer St., N. Y.:

"Dear Sirs:—We are holding subject to your order,

| | |
|---|---:|
| 616 yds White Drill N B | .50 |
| 1000 yds Black Drill 30c | 492.80 |
| | 300.00 |
| 1059 yds Moleskin 100 | 1,059.00 |
| | $1,851.80 |

"Yours truly,
"STANDARD ARTIFICIAL LEATHER CO.
"By Benjamin Kaplan."

It is clear Schwartz had simply caused this paper to be manufactured for the purpose of the trial. It was subsequently proved that he had manufactured other evidence.

Schwartz was cross-examined as to any explanation he might have for the belated production of this document. He gave several explanations, each different from the other.

Schwartz testified that the merchandise for the loss of which the present claim is asserted had been delivered to Kaplan on consignment and the invoices were dated April 21, 1921 (Nos. 192, 193, 235); April twenty-fifth (No. 304); May eleventh (No. 1294); June third (No. 1917); and June sixth (No. 2010).

His first explanation of defendant's Exhibit D-1, dated June twenty-fifth, was as follows: "Q. Each bill or each charge that you had in your books had a number, didn't it? A. Yes. Q. And each number of the invoices you had copied and sent to C. R. Young and Company you said in August? A. I think so. Q. Now, you only think so. Do you want to correct that statement? A. Can I correct it? Q. If you wish, go ahead. A. In these bills is more merchandise which we sold him outright in different bills. There was an exchange, and I sent a certain part of merchandise, and he gave me back a different paper — an exchange, and permitted him to sell a certain part. This is the correction I wish to make regarding these bills."

He gave another explanation, as follows: " Q. Will you please tell me what your purpose was in delivering that merchandise to Kaplan? A. That man used to work for us. Then he went himself into business and he came to me that I should sell the merchandise on credit. I used to sell him on credit, and I see that he can use more merchandise than I wanted to trust him with. I looked around, and he picked up fifteen or sixteen thousand dollars worth of merchandise. I said: 'Here, wait.' I said: 'I can trust you two or three thousand. If you want to have a lot of merchandise on consignment, or when you put out a few lots, you deliver customer's papers, you can get more merchandise and on that basis I can sell you goods.' He said: 'All right.' He took papers and in the banks he could not work the papers. He don't want me to know every time he got a customer. He came over to me and he says: 'Here, send me the merchandise on consignment and any merchandise which I sell I will bring you customer's papers. Before I will ship the merchandise you will find it O. K. that you want to take that man's paper.' If he will sell the lot he should bring me the paper, or I will tell him before to O. K. the sale, and I should release him that lot. He agreed in that way. I sold him a few lots outright, and when he wanted too much I gave consignment of orders. Then it came up many times he wanted to sell a few lots of these goods and he bought a few lots which he could not sell and he bought outright, and he gave me back the other lots on consignment for these lots, to release him these lots. That is the way we worked. By the Court: Q. I understand everything you say up to the end but I don't quite understand your explanation of why you are claiming any loss of the merchandise on this particular receipt, Exhibit D, when you say that the title to that merchandise had passed to him. Explain that to me again? A. This lot — part of this lot was sold outright. Then he could not sell it so quick, and it happened he got customers for some of the lots. He came to me and proposed to me that he can sell a few different lots from the consignment basis, but he wanted me to take back different lots which were sold outright, and I released him the lots from consignment basis, some of them."

Still a third explanation appears as follows: " Q. Don't you know that no place in any part of your business records is there any memorandum of that bill? A. No, this is the receipt only, the exchange which I gave him permission to sell a certain amount of merchandise, and this should remain which was sold outright — should remain on consignment."

On his examination before trial Schwartz was asked about what

documentary evidence he had to show that the transaction between him and Kaplan was a consignment merchandise transaction. His answer was " simply the receipts."

Later on in the examination before trial he was examined about the charge book and the ledger and the following occurred: " Q. Therefore, these charges would be on the ledger, wouldn't they? A. Only the ledger wouldn't say ' consignment.' "

When shown this ledger sheet Exhibit " D " at the trial of this action Schwartz insisted that it was " the original ledger sheet " and that he was making no mistake at all about it. A photographic copy of Exhibit " D " appears in the record.

This statement of Schwartz's was found to be false. The bookkeeper who prepared this fraudulent document at the dictation of Schwartz was produced later in the trial and she testified fully as to the circumstances under which this bogus ledger sheet was made up.

Miss Cash, Schwartz's bookkeeper, who had since married the former general manager of the plaintiff corporation, testified: " Q. (Handing witness paper.) I show you a ledger-sheet, page 221, that is marked Defendant's Exhibit D. Is that the real ledger sheet? A. No. Q. What became of the real ledger sheet? A. I don't know. Q. To whom did you give it? A. To A. Schwartz. Q. Abraham Schwartz sitting here? A. Yes. Q. Do you remember the time that Mr. Wood and I came to the office of the Columbia Corporation in April, 1922? A. Yes. Q. Was it before that day or after that day that the original sheet had been delivered to Abraham Schwartz? A. After."

And again: " Q. Who, if anybody, gave you instructions to write that page 221? A. What do you mean — rewrite it? Q. Yes. A. Mr. A. Schwartz."

And again: " Q. How long after July, 1921, was that erasure and correction made in your book? A. At the time that we rewrote those sheets we changed the entries. Q. At the time you rewrote this 221? A. Yes. Q. Under direction of Mr. Schwartz? A. Yes. Q. When you rewrote it you added these words, ' on consignment,' did you not? A. I did. Q. And you put the ditto marks there? A. Yes. Q. And that was under the direction of Mr. Abraham Schwartz? A. Yes."

As the ledger sheet covered a considerable period of time during which there had been another bookkeeper, Schwartz took the precaution of having the bogus ledger sheet written partly in the handwriting of Miss Cash and partly in the handwriting of one of the stenographers, a Miss Becker.

When closely interrogated by the court this woman admitted

that she had committed perjury on one of the other trials at which she had testified that the ledger sheet was the original and genuine one and her explanation was, " I was employed by the Columbia at the time and naturally I did not tell them that it was a duplicate sheet." On the question of whether the original ledger sheet had contained the words " on consignment " which appears on defendant's Exhibit D, Miss Cash insisted that she was not sure, although she thought perhaps they had also appeared on the original sheet.

Finally, it appeared that this ledger sheet had been forged and rewritten not merely once, but several times. Thus Miss Cash testified: " Q. Please be frank with the court. Tell us how many times that page was written before 221, Exhibit D was written? A. I cannot recall how many times. Q. About? A. About three or four times. Q. And to whom did you pass the original ledger record? A. Mr. A. Schwartz. Q. Abraham Schwartz? A. Yes. Q. Isn't it a fact that when the ledger sheet was originally written, there did not anywhere appear thereon the words, ' on consignment? ' A. Well, I don't know, I don't see the original sheet."

Apparently the significance of this palpable fraud on the part of Schwartz and its relation to the terms and conditions of the policy of insurance under which this action is brought was not recognized by the trial court.

It was clearly established by the evidence that Schwartz acting for the Columbia Corporation made not one, but many, false statements " before or after loss," and hence under the plain provisions of the New York standard fire insurance policy, the policy is null and void.

That Miss Cash was testifying truthfully when she said that the ledger sheet had been rewritten " about three or four times " is amply demonstrated by the fact that the certified public accountant, who was retained by the creditors after the plaintiff Columbia Corporation went into bankruptcy in October, 1923, to try and find out where the assets were being concealed, found another copy of this same ledger sheet when he took possession of the company's books and records. This other ledger sheet was produced by him at the trial and was marked in evidence as defendant's Exhibit P, a photographic copy of which appears in the record.

In spite of the claim of Schwartz in this case that the goods were sent to Kaplan on consignment only, the record is replete with uncontradicted evidence that Kaplan presented a claim to his insurance companies for the same identical goods, claiming that there had been an outright sale to him. The documents produced by Kaplan in support of this claim emanated from the office of the

First Department, July, 1925.          [Vol. 213, App. Div.]

Columbia Corporation and they all indicate that the sale to Kaplan was a consummated transaction.

It is unnecessary, however, to struggle through this tangled record further. The trial justice was fully justified in stating at the end of the case: " This is a most perplexing case, hóneycombed with perjury." Instead of directing a verdict for the plaintiff, however, as he did, he should have granted judgment for defendant in accordance with the evidence, and in view of the plain and specific provisions of the policy quoted at the beginning of this opinion.

For the above reasons the judgment should be reversed, with costs, and the complaint dismissed, with costs.

CLARKE, P. J., DOWLING, MERRELL and McAVOY, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs.